# Simpson's Estate.

*Executors and administrators—Entering security—Act of March* 29, 1832, *P. L.* 190.

An executor who is also residuary legatee and devisee after the death of his mother under his father's will, and who has under a power in the will leased coal lands belonging to the estate, will not be required to enter security after his mother's death, for the payment of money

legacies which were directed to be paid at intervals after the death of the life tenant, where it appears that the real estate apart from the unmined coal, was worth three times the amount of the legacies, that the executor had a considerable sum in cash in bank, and that he had not been guilty of any waste or mismanagement, although at an early date in the administration of the trust, when he had but little money in his hands, he had failed to keep a separate bank account of the trust funds.

*Will—Gift on personal property—Life tenant.*

Where a husband by his will gives to his wife all his estate real and personal for her natural life, the wife is entitled to all of the personalty absolutely.

Argued March 1, 1907. Appeal, No. 41, Jan. T., 1907, by Frances E. Simpson et al., from decree of O. C. Lackawanna Co., No. 989, Series A., dismissing petition to enter security in Estate of George W. Simpson, deceased. Before RICE, P. J., PORTER, HENDERSON, ORLADY, HEAD and BEAVER, JJ. Affirmed.

Petition to compel executors to enter security.

SANDO, P. J., filed the following opinion :

This proceeding is upon a citation to Mark C. Simpson, executor of the will of George W. Simpson, deceased, to give security, under sec. 22 of the Act of March 29, 1832, P. L. 190.

The petitioners are here appealing to this court under a statutory proceeding, and it is a well-known principle of law that a statute must be strictly construed ; therefore, unless it can be shown that the executor has violated the authority given by the will or that he has mismanaged or is jeopardizing the estate, the petition of the legatees must be dismissed.

In their petition they have alleged two grounds on which they ask this court to make the executor give security—first, that he has sold and conveyed to the Pennsylvania Coal Company a large and valuable tract of coal, being a large part of the value of the real estate belonging to the estate, without authority, and causing the coal to be mined and is using the proceeds thereof for his own purposes ; second, that for several years past, he has become intemperate in his habits and is using the personal property in his possession in a reckless and careless manner, and that the petitioners fear that at the ex-

piration of the period of time when the legacies become payable, not enough money belonging to the estate may be found to pay the legacies.

This proceeding, to a considerable extent, involves the construction of the will of the testator, from which it becomes necessary to give some pertinent extracts.

By the will, the testator first bequeaths, by clause one, to his wife, all the furniture, chattels, effects, etc., in and about his dwelling house ; and by clause two, bequeaths to his son William, all his right, title and interest in certain contracts made by the testator for the sale of various tracts of land in Dunmore.

He next directs by clause three, that, " All the rest, residue, and remainder of my estate, real and personal, wheresoever the same may be, I give and devise unto my said wife Mary Jane, during her natural life."

He then, by clause four, directs that, " From and after the decease of my wife, I give and bequeath as follows : Unto my grand-daughter, Alice Vickers, I give and bequeath three thousand dollars, to be paid by my executor within three years from the death of my wife. I also bequeath to said Alice Vickers my horse, harness, buffalo robe, and best buggy. I give and bequeath unto the husband of said Alice Vickers, E. E. Vickers, five hundred dollars, to be paid by my executor within five years from the death of my wife. I give and bequeath to my great grand-daughter, Jeanne Vickers, one thousand dollars, to be paid by my executor when said Jeanne shall reach the age of eighteen years. To Eugene Simpson, wife of my son William, I give and bequeath one thousand dollars, to be paid by my executor within five years from the death of my wife. To my grandchildren, May, Lois and Mary Jane, children of my son, Mark C. Simpson, I give and bequeath one thousand dollars each, to be paid by my executor to each one when she shall reach the age of eighteen years. To Milly, wife of my son, Mark C. Simpson, I give and bequeath one thousand dollars, to be paid by my executor within five years from the death of my wife."

He then, by clause six, gives, " All the rest, residue, and remainder of my estate, real and personal . . . . unto my son, Mark C. Simpson, his heirs and assigns forever."

He then, by clause seven, appoints Mark C. Simpson sole executor, and then continues as follows:

" And I hereby give and grant unto my son Mark, my executor, full power and authority to grant, bargain, and sell any and all real estate of which I may die possessed, seized or in any manner entitled to, whenever it shall be necessary to carry out the provisions of my will. . . ."

The testator, George W. Simpson, died May 10, 1895, and his widow, Mary Jane Simpson, died June 22, 1905.

It is to be noted that the executor had no right to use any of the personal property of the estate to carry out the provisions of the will for, under clause three, this was all left to the testator's wife, the mother of the executor. All of the personal property belonged, therefore, to the wife absolutely, if she cared to use it, during her natural life, as will appear from the following cases : Markley's Est., 132 Pa. 352; Gold's Estate, 133 Pa. 495; Heppenstall's Est., 144 Pa. 259.

In 1897, after paying many of the expenses necessary and incidental to administering the estate, the executor had in his possession about $600 belonging to the estate. There was no income from the estate ; taxes, insurance and expenses of repairs had to met; the widow maintained; on January 20, 1898, a legacy of $1,000 would be due the granddaughter, May; on April 6, 1900, a legacy of $1,000 would be due the granddaughter, Lois; on January 30, 1904, a legacy of $1,000 would be due the granddaughter, Mary Jane, and without money coming in that the executor could use, he proceeded under the clause in the will which authorized him to dispose of the real estate when needed to carry out the provisions of the will, namely, clause seven, in which testator authorized his executor to sell any and all real estate " whenever it shall be necessary."

In the absence of proof of error or mistake or willful disregard of duty, the court will not interfere. with the exercise by executors, in their discretion, of a power to sell real estate : Castor's Estate, 16 Phila. 360.

The testator in naming Mark C. Simpson as executor seemed to have confidence in his good judgment and integrity, conferred upon him the widest discretion, and gave him " full power and authority to grant, bargain, and sell any and all

real estate . . . . whenever it shall be necessary to carry out the provisions " of the will.

In the exercise of this discretion the executor deemed it advantageous and necessary to make the lease, dated November 9, 1897, recorded in Lackawanna county, December 9, 1897, in deed book No. 158, at page 160, with the Pennsylvania Coal Company. There is no testimony to show that this was not without knowledge to all parties interested, nor to show that anyone took steps to interfere with or prevent the making of the lease.

The widow dying on June 22, 1905, by the provisions of clause four of the will there will be due Alice Vickery, $3,000, within three years, that is, in June, 1908; to E. E. Vickers, $500, within five years, that is, in June, 1910; to Jeanne Vickers, $1,000, when she shall reach the age of eighteen years, that is, on August 11, 1908; and to Eugene Simpson, wife of the testator's son William, $1,000 within five years, that is, in June, 1910.

It is contended by the learned counsel for the petitioners that the executor, under the testimony and the decisions in McKennan's Appeal, 27 Pa. 237; Estate of Williamson, 18 Phila. 63, and Parker's Estate, 64 Pa. 307, is brought within section 22 of the Act of March 29, 1832, P. L. 190, and should be required to give security.

What has the executor done, not authorized by the will, and to sustain the allegations of mismanagement of the estate or the property under his charge? The mismanagement alleged is that the executor built a house and mingled his own funds with the funds of the estate.

The Pennsylvania Coal Company has paid the executor in royalties for 35,163 tons of coal mined, since the making of the lease in 1897, the sum of $13,900. The executor has made disbursements up to March 25, 1905, a date prior to the death of the widow, for maintenance of the widow; legacies amounting to $3,000; necessary charges of taxes, insurance and re-pairs; built a new house at the cost of $4,300 on land belonging to the estate; and has a balance in the bank of $2,723.83.

Inasmuch as the new house was built in the year 1900, during the lifetime of the widow, and a second partial account, taking credit for the payments for the new house, filed March

25, 1905, and no exceptions thereto being taken, it cannot be contended that the building of, and the payment for, the new house is mismanagement.

There is no testimony whatever of the application by the executor of the funds of the testator to the payment of his own debts, as in McKennan's Appeal, or that the moneys have been used in trade or business or gross dereliction of duty as in the estate of Williamson.

This proceeding was begun November 13, 1905, and the first hearing was on, and testimony taken December 11, 1905. On December 20, 1905, the executor deposited in the bank to the credit of the estate of G. W. Simpson the sum of $3,015. At the hearing on January 22, 1906, the respondent testified " that I had no money in the bank in the estate's account " at the time of the former hearing, and that the money of the estate was included in his own account.

Among the first duties of an executor or other trustee is to separate the moneys of the trust from his own, and deposit the same not in his own individual name, but in his name as an executor.

It was improper and an unlawful act for the executor to mix the trust funds to any extent with his own. However clear it may be that it was without any dishonest intention of making gain to himself, such a practice ought never come before a court without being in some way marked with its disapprobation. The mingling of the estate's money with his own is an indefensible practice which has always been condemned by the courts.

When the executor is authorized to sell the real estate at such time as he may deem necessary to carry out the provisions of the will and he does so, acting in good faith and under advice of counsel, and although depositing the money received from the royalties in his own personal account, does not use the same for his own purposes, and is always ready to make distribution when necessary and pay legacies when due, we are not prepared to visit him with the penalty of compelling him to enter security.

The money deposited in the bank since the commencement of this proceeding is now money of the estate, but it was not such till after the death of the widow, in June, 1905.

The undisputed testimony shows the value of the real estate to be from $15,000 to $17,000, exclusive of the coal; that there remains to be mined, including the 17,000 tons in the pillars, from 29,000 to 30,000 tons of coal, and that is deposited in the bank to the credit of the estate about $2,700. The security is therefore ample for the legacies, amounting to $5,500, which are not yet due. The testimony fails to show any neglect or mismanagement of the estate.

With regard to the testimony as to the alleged intemperate habits, one witness testified that he saw the respondent intoxicated about eight years ago, a second witness that he saw him intoxicated about fourteen months ago, and a third witness that shortly after the death of the respondent's wife in May, 1904, she saw him intoxicated.

But with this insufficient testimony it is not shown that he is wasting or mismanaging the estate.

It is contrary to the spirit of the law to ask an executor, in whom the testator had confidence, to give security, unless he is wasting or mismanaging the estate. This is very clearly and distinctly set forth in Parsons' Estate, 82 Pa. 465, where the court, inter alia, says : " It must clearly appear that the executor is wasting or mismanaging the property or estate under his charge, or that for any reason the estate or property is likely to be jeopardized by the continuance of such executor before the court can interfere."

Now, April 7, 1906, the petition to show cause why Mark C. Simpson, executor, should not give security, is dismissed.

*Error assigned* was the decree of the court.

*H. M. Hannah,* for appellant.—The application, by an executor, of the funds of the estate to the payment of his own debts, is mismanagement, and the parties interested may demand security under the Act of March 29, 1832, P. L. 190 : McKennan's Appeal, 27 Pa. 237.

The solvency of the executor is no answer to an act of mismanagement: McKennan's Appeal, 27 Pa. 237 ; Cryder's Appeal, 11 Pa. 72.

Among the first duties of an executor or other trustee is to separate the moneys of the trust from his own and deposit the

same, not in his own individual name, but as executor, in a bank, saving fund or trust company : Estate of Caroline Williamson, 18 Phila. 63 ; Parker's Estate, 64 Pa. 307.

*Walter Briggs*, for appellee.

OPINION BY HEAD, J., October 7, 1907 :

George W. Simpson died in 1895, testate. By his will he made the following provisions for his widow who survived him, viz.: "I give and bequeath to my wife Mary Jane Simpson, all the books, paintings, linen, china, household goods, furniture, chattels and effects (other than money or securities for money) which shall, at my death, be in and about my dwelling house at Dunmore, Pa." After giving to his son William the moneys due the testator on a number of contracts for the sale of real estate made in his lifetime, aggregating about $5,000, he further provides as follows :

"All the rest, residue and remainder of my estate, real and personal, wheresoever the same may be, I give and devise unto my said wife, Mary Jane during her natural life." The testator then proceeded to bequeath to certain grandchildren, the appellants, specific money legacies payable at certain stated periods after the death of his wife, the earliest of these, in point of time, maturing three years after the date of that event. As the widow survived until June, 1905, no one of these legacies has yet become payable. In the aggregate they amount to $5,500, the first falling due in 1908, the last in 1910. The testator also bequeathed to each of three grandchildren, daughters of his son Mark, the appellee, the sum of $1,000, payable when each should reach the age of eighteen years. These three legacies matured in the lifetime of the widow.

The testator finally provided as follows : "All the rest, residue and remainder of my estate, real and personal, I give, devise and bequeath unto my son Mark C. Simpson, his heirs and assigns forever." He then appointed his son Mark sole executor and gave to him "full power and authority to grant, bargain and sell any and all real estate of which I may die possessed, etc., whenever it shall be necessary to carry out the provisions of my will," etc.

When, therefore, the legacies in favor of the appellee's children fell due, it became his duty to provide the necessary funds to

pay them. There was no personal estate from which the money could be raised because it had all been previously appropriated by the bequests to the son William and the widow. The latter, as the court below properly held under the authority of Markley's Estate, 132 Pa. 352; Gold's Estate, 133 Pa. 495; Heppenstall's Estate, 144 Pa. 259, must be regarded as the first object of the testator's bounty. She was entitled to the possession of the entire personal estate, save the money given to William, and to consume it if she chose to do so. The executor, therefore, did nothing more than he was fully authorized to do, both by the letter and spirit of the will, when in 1897, he executed a lease of the coal underlying the land of which testator died seized. This lease was so drawn that the mining of the coal therein authorized would extend over a period of years producing annual payments to the estate proportioned to the amount of coal mined.

In November, 1905, the appellants filed a petition in the orphans' court, under the Act of March 29, 1832, P. L. 190, praying for a decree requiring the executor to give security for the payment of their legacies as they would become due, and assigning as reasons therefor, (a) that the executor had made sale of said coal not for the purpose of carrying out the will of the testator, " but for his own use, and is causing the coal to be mined and is using the proceeds thereof for his own uses and purposes ; " and (b) because " for several years past the said respondent has become intemperate in his habits, and is using the personal property in his possession in a reckless and careless manner."

The learned court below found the testimony offered in support of the latter allegation to be trivial and insufficient. He could not well have found otherwise. Indeed we do not understand that the appellants now press this as a ground for a reversal. As to the remaining averment in the petition of waste and mismanagement, based on an unnecessary sale or lease of the coal, the court finds that the executor had received in royalties down to the time of hearing, $13,900, and expended the same in large part as follows, viz.: " The executor has made disbursements up to March 25, 1905, a date prior to the death of the widow, for maintenance of the widow ; legacies amounting to $3000 ; necessary charges of taxes, insurance

and repairs; built a new house, at a cost of $4,300, on land belonging to the estate; and has a balance in bank of $2,723.83."

The answer of the respondent sets forth the detailed expenditures under each of the several heads generalized by the court and we do not understand the correctness of these figures to be assailed. The court further finds that " the undisputed testimony shows the value of the real estate to be from $15,000 to $17,000 exclusive of the coal; that there remains to be mined, including the 17,000 tons in the pillars, from 29,000 to 30,000 tons of coal; and that there is deposited in bank to the credit of the estate about $2,700." The testimony shows that the lessor not only reserved, from the operation of the lease, what is known as the "upper vein," but that he also reserved one-third of the three lower veins included in the lease, so that, as the engineer testifies, " they are bound to leave the one-third of the coal in." The conclusion therefore reached by the lower court, viz.: "the security is ample for the legacies, amounting to $5,500, which are not yet due; the testimony fails to show any neglect or mismanagement of the estate," is almost irresistible.

It did appear in the testimony, although it was not averred in the petition, that at an earlier date, when there was but little money in his hands, the executor had failed to keep a separate bank account of the trust funds in his hands, thus permitting them to be mingled with his own. Inasmuch as the entire estate belonged to the executor in his own right as residuary legatee, subject only to a liability to pay the legacies of appellants when due; as the property yet undisposed of was ample to extinguish this liability and as the irregularity had been corrected by the opening of a proper account in which the trust funds were being regularly deposited, the learned court, whilst noting the impropriety of the past conduct of the appellee, did not feel warranted, under all the circumstances, in compelling the executor to give security. In this we see no abuse of the powers conferred by the statute. On every branch of the case the opinion filed so fully vindicates the decree entered that it ought to have convinced the appellants they had no substantial ground for complaint. The assignments of error are overruled.

Decree affirmed at the costs of appellants.